**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| BRAINCHILD SURGICAL DEVICES, LLC, a New York limited liability company, on behalf of themselves and those similarly situated, | |
| Plaintiff, | Case No. 1:21-cv-00554-RDA-LRV |
| v. | **REDACTED VERSION OF DOCUMENT FILED UNDER SEAL** |
| CPA GLOBAL LIMITED a foreign entity formed under the laws of the Island of Jersey, Channel Islands, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CPA GLOBAL LIMITED'S**
**MOTION TO EXCLUDE THE TESTIMONY OF DAVID A. CASS**

## **<u>TABLE OF CONTENTS</u>**

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    A.    Nature of the Case........................................................................................2

    B.    Mr. Cass's Background and Experience .....................................................3

    C.    Mr. Cass's Opinions.....................................................................................5

        1.    The RSAs that Mr. Cass reviewed are "substantially the same" .................5

        2.    CPA Global's invoices are "opaque"...........................................................6

        3.    CPA Global's Country Charge should have been limited to CPA Global's costs .................................................................................................7

        4.    A "'reasonable' Funds Management rate would be 7.4%"...........................7

        5.    Mr. Cass's "overcharge" estimates ..............................................................8

LEGAL STANDARD.............................................................................................................9

ARGUMENT .........................................................................................................................10

I.      MR. CASS IS NOT QUALIFIED TO OFFER HIS OPINIONS IN THIS CASE ...........10

II.     MR. CASS SHOULD NOT BE PERMITTED TO OFFER LEGAL OPINIONS...........13

III.    MR. CASS'S OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE ...................15

    A.    Mr. Cass's Opinions Regarding the RSAs He Reviewed Are Unreliable ............16

    B.    Mr. Cass's Opinions About CPA Global's Costs Are Equally Unsupported and Speculative ........................................................................................19

        1.    CPA Global's costs to renew non-U.S. patents .........................................19

        2.    CPA Global's costs for funds management ................................................19

        3.    CPA Global's ability to provide cost information .....................................22

    C.    Mr. Cass's Opinion That CPA Global's Pricing and Billing Is Opaque Is Irrelevant and Unsupported.......................................................................22

    D.    Mr. Cass's Methodology for Estimating Class-Wide Damages Is Unreliable.................................................................................................24

CONCLUSION......................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
   214 F. Supp. 2d 530 (D. Md. 2002) ...................................................................10, 11, 12, 13

*Berry v. Crown Equip. Corp.*,
   108 F. Supp. 2d 743 (E.D. Mich. 2000) .........................................................................24

*Carlisle v. Allianz Life Ins. Co. of N. Am.*,
   2021 WL 5104703 (E.D. Va. Sept. 13, 2021) ................................................................14

*Clarendon Regency IV, LLC v. Equinox Clarendon, Inc.*,
   2022 WL 5101691 (E.D. Va. Oct. 4, 2022) ..............................................................14, 15

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ......................................................................................9, 16

*Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*,
   509 U.S. 579 (1993) .........................................................................................1, 10, 16, 21

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ..........................................................................................20

*Edmondson v. RCI Hosp. Holdings, Inc.*,
   2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ..............................................................23

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ..................................................................................................16, 21

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................10, 11, 16

*Navigators Ins. Co. v. Goyard, Inc.*,
   608 F. Supp. 3d 44 (S.D.N.Y.) .......................................................................................23

*Oglesby v. General Motors Corp.*,
   190 F.3d 244 (4th Cir. 1999) ..........................................................................................16

*Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*,
   27 F. Supp. 3d 671 (E.D. Va. 2013) .........................................................................10, 11

*SMD Software, Inc. v. EMove, Inc.*,
   945 F. Supp. 2d 628 (E.D.N.C. 2013) .......................................................................11, 13

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
    878 F.2d 791 (4th Cir. 1989) ...................................................................................11

*Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*,
    29 F.3d 137 (4th Cir. 1994) .....................................................................................16

*U.S. v. Nacchio*,
    555 F.3d 1234 (10th Cir. 2009) .................................................................................9

*United States v. Barile*,
    286 F.3d 749 (4th Cir. 2002) ...................................................................................14

*United States v. Perkins*,
    470 F.3d 150 (4th Cir. 2006) ...............................................................................9, 14

*United States v. Vista Hospice Care, Inc.*,
    2016 WL 3449833 (N.D. Tex. June 20, 2016) ........................................................24

*United States v. Wilson*,
    484 F.3d 267 (4th Cir. 2007) ...................................................................................16

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    2021 WL 6690337 (E.D. Va. Aug. 16, 2021)....................................................14, 15

## <u>Rules/Statutes</u>

Federal Rule of Evidence 104...................................................................................................1

Federal Rule of Evidence 402...................................................................................................1

Federal Rule of Evidence 403................................................................................................1, 9

Federal Rule of Evidence 701...................................................................................................9

Federal Rule of Evidence 702...................................................................................1, 9, 10, 15

Pursuant to the Court's August 9, 2023 Scheduling Order, Dkt. 165, Federal Rules of Evidence 104, 402, 403, and 702, and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993), Defendant CPA Global Limited ("CPA Global" or "Defendant") respectfully moves to exclude the testimony and opinions of Plaintiff Brainchild Surgical Devices, LLC's ("Brainchild") proffered expert, David A. Cass.

## INTRODUCTION

This is a putative class action for breach of contract. The gravamen of Brainchild's claim is that CPA Global overcharged it and putative class members for providing patent renewal services. Brainchild proffers David Cass as an expert to opine on several key issues in the case, including the meaning of CPA Global's Renewal Service Agreements ("RSAs"), CPA Global's costs for funds management and foreign patent renewals, and the extent to which CPA Global purportedly overcharged its customers. Mr. Cass, however, is uniquely *unqualified* to offer these opinions. He has spent his entire career working in the area of information technology. As he testified, ██████████████████████ Ex. 1 (Cass Dep. Tr.) at 52:21-22. He has never worked in the patent renewals field; he has never been a patent renewals service customer or even talked with any patent renewals service customer; he has never seen any patent renewals contracts other than the CPA Global contracts he reviewed in this case; and he could not name a single competitor of CPA Global. Nor does he have other relevant education and experience on which to base his opinions in this case. Instead, Mr. Cass tries to hide his lack of relevant qualifications behind his general "global business" experience. But that experience is insufficient. In short, he has no relevant expertise to offer in this case, and his testimony should be excluded on that basis alone.

Mr. Cass's testimony should be excluded for two additional reasons. *First*, Mr. Cass seeks to offer legal opinions on the meaning of the terms of the RSAs, as well as the ultimate legal issue

1

of whether CPA Global's clients were overcharged under their contracts.  Mr. Cass's attempt to offer impermissible legal opinions should be rejected.  *Second*, Mr. Cass's opinions are entirely unreliable.  His legal opinions about the meaning of the RSAs are nothing but his own say-so and are contradicted by the plain language of the RSAs themselves.  He has no basis for his speculative opinions about CPA Global's costs for funds management or to renew foreign patents.  His opinion that CPA Global's billing practices are "opaque" is more than just baseless—it is contradicted by the RSAs and industry practice.  And his "overcharge" damages estimates, which are based on these same deeply flawed assumptions, introduce entirely new problems, including that they are based on an improperly drawn, non-random sample and fail to exclude clients that Mr. Cass himself agrees should not be members of the class.

For all of these reasons, Mr. Cass's unsupported, unreliable opinions in an area in which he has no relevant expertise should be excluded.

## BACKGROUND

### A.      Nature of the Case

Brainchild is a medical device company.  First Am. Compl. ("FAC"), Dkt. 23, ¶ 1.  In April 2018, Brainchild entered into an RSA with CPA Global under which CPA Global would renew Brainchild's patents world-wide in exchange for certain fees.  *Id.* at ¶¶ 2, 14, 24.  This arrangement worked for several years without incident until March 2021, when Brainchild was solicited by its current counsel.  Ex. 2 (Sherwinter Dep. Tr.) at 175:9-176:14.  Up until that point, Brainchild did not believe CPA Global had overcharged it.  *Id.* at 176:24-177:8.  Less than two months later, in May 2021, Brainchild filed this putative class action, alleging that CPA Global breached the RSA by purportedly overcharging Brainchild and putative class members for the renewal of non-U.S. patents.  FAC ¶¶ 2–4.  Specifically, Brainchild alleges that CPA Global's "Service Charge was agreed to be the consideration due to CPA for its services.  The rest of the charges were agreed to

2

be external costs passed on to clients by CPA." *Id.* ¶ 27.  Brainchild never confronted CPA Global with this concern before filing suit, after which it summarily terminated the RSA.  Ex. 2 at 132:12-19, 195:13-16.

Brainchild's initial complaint brought claims on behalf of itself and a putative class for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent concealment, unjust enrichment, and injunctive relief.  Compl., Dkt. 1.  On April 1, 2022, the Court granted with prejudice CPA Global's motion to dismiss Brainchild's claims for breach of the implied covenant, unjust enrichment, and injunctive relief, and dismissed without prejudice Brainchild's fraudulent concealment claim.  Apr. 1, 2022 Mem. Op. & Order, Dkt. 22, at 10. Brainchild subsequently filed an amended complaint, and on January 11, 2023, the Court again granted CPA Global's motion to dismiss the fraudulent concealment claim, this time with prejudice, leaving Brainchild's breach of contract claim as the only surviving cause of action. Jan. 11, 2023 Mem. Op. & Order, Dkt. 30, at 1.

Brainchild's core allegation is that CPA Global breached its contracts by charging Brainchild and putative class members Country Charges and charges for funds management that exceeded CPA Global's costs.  These terms are defined in the RSA.  *See* Ex. 3 §§ 5.3, 5.6.  Under Brainchild's interpretation of the RSA, the only component of CPA Global's fees on which CPA Global was entitled to add a mark-up was the "Service Charge" agreed upon by the parties.  FAC ¶¶ 3, 27.  In Brainchild's view, CPA Global was not permitted to mark-up either the "Country Charge" or the "funds management charge" to account for anything beyond its "actual costs." FAC ¶ 3.

### B.    Mr. Cass's Background and Experience

Mr. Cass is currently a Managing Director and the Chief Information Security Officer for GSR, and a Senior Partner at Law & Forensics.  Ex. 4.  Mr. Cass testified that ███████████



■■■■■■■ Ex. 1 at 44:8-13.  In reality, however, Mr. Cass's background is overwhelmingly in the area of information technology, with a focus on IT security and risk management.  Every position he has ever held has some form of "information," "technology," or both in his job title, other than his title of "Senior Partner" with Law & Forensics.  *See* Ex. 4.  Among other things, he has developed IT security programs at Max Blau & Sons and PriceWaterhouseCoopers; led the IT risk management team at JP Morgan, Freddie Mac, and Elsevier; served as the Chief Information Security Officer for IBM's cloud computing services group; and led the Cyber & IT Risk group at the Federal Reserve Bank of New York.  *Id.*

Notably, Mr. Cass has no experience in the patent renewals field.  He testified point-blank that ■■■■■■■ Ex. 1 at 52:21-22. ■■■■■■■ ■■■■■■■, *id.* at 53:17-19; ■■■■■■■, *id.* at 122:2-4; ■■■■■■■, *id.* at 87:1-18. ■■■■■■■ *Id.* at 60:5-11. ■■■■■■■ ■■■■■■■. *Id.* at 56:6-9. ■■■■■■■ ■■■■■■■ *Id.* at 85:9-22, 86:10-15. ■■■■■■■ ■■■■■■■ *Id.* at 79:8-82:20.

Mr. Cass also has little first-hand experience with the types of financial issues implicated by his opinions about CPA Global's funds management charge.  For example, ■■■■■■■ ■■■■■■■ ■■■■■■■ *Id.* at 61:17-62:6, 74:19-75:11.  When pressed about

his lack of experience in these areas, Mr. Cass responded by ██████████████████████

██████████████████████████████████████████████.  *See, e.g.*, *id.* at

80:19-81:12 (██████████████████████████████████████████████

██████████████████████████████████████████████).

### C.     Mr. Cass's Opinions

On May 8, 2023, Mr. Cass served his initial report in this case.  Ex. 5 (Expert Report of David A. Cass ("May 8 Report")).  On July 24, 2023, he served a supplemental report.  Ex. 6 (Supplemental/Rebuttal Expert Report of David A. Cass ("July 24 Report")).  And on August 27, 2023, he served a reply report without Court approval, which he subsequently amended on September 13, 2023, following the Court's order striking certain portions of the report.  Ex. 7 (Amended Reply Report of David Cass ("Sept. 13 Report")).  Across his three reports, Mr. Cass proffers the following key opinions.

### 1.     The RSAs that Mr. Cass reviewed are "substantially the same"

Based on an extensive analysis of ███ RSA versions used by CPA Global to prepare RSAs for its clients, and a sample of ███ RSAs of putative class members, CPA Global's expert, Dr. Divya Mathur, opined that there was substantial variation in CPA Global's terms of agreement with putative class members.  *See* Ex. 8 at ¶¶ 10-11.  Based on his review of the same ██ RSAs,[1] Mr. Cass "determined that while the language used in the contracts varied to a minor degree, the substantive definitions of the categories of charges that constitute the total fee charged to each customer were substantially the same."  July 24 Report ¶ 42.  This sentence is the extent of Mr.

---

[1]   Mr. Cass testified that ████████████████████████████████████████

██████████████████ Ex. 1 at 158:19-162:6.

Cass's opinion and analysis—he offers no reasoning, evidence, or facts to support it.[2]  During his

deposition, Mr. Cass clarified that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████  Ex. 1 at 169:3-170:25.

      In the Reply Expert Report of Divya Mathur, Ph.D., dated August 21, 2023, Dr. Mathur

analyzed two additional samples of ████ RSAs, which further support "the conclusion in my

rebuttal report that there is no 'standard' contract that governs the economic relationship between

CPA Global and putative class members."  Ex. 8 at ¶¶ 6, 13, 28.  In response, in his September 13

Report, Mr. Cass opines that "Individual Inquiry Isn't Necessary Because The Contract Language

Is Not Substantially Different For the Each [sic] of the Renewals."  Sept. 13 Report at 1.  This

opinion appears to be based on Mr. Cass's review of just a handful of provisions in only nine of

the ████ RSAs analyzed by Dr. Mathur.  *Id.* at ¶¶ 3, 17-18.

      2.    CPA Global's invoices are "opaque"

      In his July 24 Report, Mr. Cass opines that CPA Global's invoices are "opaque" because

they do not itemize the components of the Country Charge and "Funds Management Charge."  July

24 Report ¶ 12.  During his deposition, Mr. Cass admitted that ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████  Ex. 1 at 125:1-7

(emphasis added).  He also conceded that ████████████████████████████████████

████████████████████████████████████████████████████████████████

_____

[2]  Mr. Cass explained that ██████████████████████████████████████████

████████████████████████████████████████████████████████████  *Id.* at

165:11-166:4.

████████████████████████████████████████████████████████  *Id.* at 150:19-

153:23.

>    3.    CPA Global's Country Charge should have been limited to CPA Global's
>           costs

Mr. Cass opines that CPA Global's Country Charge should have been limited to what CPA

Global "pay[s] their foreign agents, *plus any reasonable internal costs*, which is what a reasonable

customer would expect based on the contracts and renewal notices." July 24 Report ¶ 7 (emphasis

added). At other times, Mr. Cass opines that CPA Global cannot charge for any costs other than

third-party agent costs, because "CPA builds their infrastructure cost into the Service Fee," *id.* at

¶ 16, and "additional country specific personnel would not be required," *id.* at ¶ 20-21; *see also*

Ex. 1 at 199:12-14 (██████████████████████████████████████████████████████

████████████████████████████████). Accordingly, when calculating his estimated

"overcharges" related to the Country Charge, Mr. Cass assumed that any third-party agent fees

were appropriate, but that any other amounts were not appropriate "because no country specific

personnel are required to complete renewals." July 24 Report ¶ 45.

>    4.    A "'reasonable' Funds Management rate would be 7.4%"

While Mr. Cass opines that CPA Global's funds management charge should be limited to

its "actual costs," *id.* at ¶ 5, he also allows for the (inconsistent) possibility that CPA Global may

be "allowed to charge for its costs plus make a profit on this amount," *id.* at ¶ 38. In his May 8

Report, Mr. Cass opined that a reasonable range for CPA Global's funds management charge

would be 3.5% to 21%. *Id.* at ¶ 34. In his July 24 Report, however, Mr. Cass abandoned this

range, instead opining that 7.4% would be a "'reasonable' Funds Management rate" for every

putative class member if a profit component is allowed, but that 3% would be an appropriate fee

if only pass-through costs are allowed. *Id.* at ¶¶ 47-48. Mr. Cass provides an estimated rate for

each of the components that add up to his 7.4% estimate, *see id*. at ¶ 33, but fails to explain how he arrived at 3% if CPA Global is entitled only to pass on its costs.



Under cross-examination, Mr. Cass conceded that ██████████████████████████ ██████████████████████████████████████████████.” Ex. 1 at 269:21-25, 276:18-24, 285:2-25, 301:25-302:6, 304:24-305:3, 314:7-14.  He admitted that ██████████ ███████████████████████████████████████████████, *id*. at 271:11-16, 277:20-278:1, 286:2-9, 305:6-16—and that ████████████████████████, *id*. at 271:17-272:2, 278:5-9, 305:18-306:2, 318:6-13.  Likewise, Mr. Cass admitted that █████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████ *Id*. at 320:12-321:6.

     5.    <u>Mr. Cass's "overcharge" estimates</u>

In his July 24 Report, Mr. Cass estimates that the total overcharge to CPA Global's U.S.-based accounts with less than 101 non-U.S. patent renewals in a given year during the putative class period is ████████. July 24 Report ¶ 59.  Using a non-random sample of 600 renewals that were all selected from a two-week period in January 2017 (and excluded the remaining six-plus years of the putative class period), Mr. Cass calculated a rate and "average amount" of overcharge for both the Country Charge and funds management charge.  *Id*. at ¶ 42 & n.47.  He then applied these rates and averages to the entire population of CPA Global's U.S.-based accounts with less than 101 non-U.S. patent renewals in a given year during the class period to arrive at a total overcharge of ████████ for the Country Charge and ████████ for the funds management charge.  *Id*. at ¶ 59.

Mr. Cass's estimates are predicated on the key assumptions described above, namely (a) there is no substantial difference among the RSAs warranting different treatment in his damages model; (b) CPA Global's Country Charge should have been limited to third-party agent fees; (c)

7.4% is an appropriate funds management charge for all putative class members; and (d) putative class members who negotiated their contracts with CPA Global can be excluded, even though he made no attempt to do so.  *Id*. at ¶¶ 42, 44-46, 62.  Nor did Mr. Cass attempt to exclude other clients who were aware that CPA's Global's Country Charge and funds management charge were not limited to its pass-through costs, ███████████████████████████████

███████.  Ex. 1 at 336:4-339:17; *see also id*. at 123:7-19 (███████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████).

## LEGAL STANDARD

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of proof.  *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001).

Expert opinions "must be helpful to the trier of fact, in accordance with Rules 701 and 702, and must not waste time, in accordance with Rule 403."  *United States v. Perkins*, 470 F.3d 150, 157 (4th Cir. 2006).  The purported expert must be qualified "by knowledge, skill, experience, training, or education to render an opinion," and "if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable."  *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

Expert testimony is reliable (and therefore admissible) only if it is "ground[ed] in the methods and procedures of science" based on facts, not mere "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). To be admissible under *Daubert*, an expert's opinion must have a "valid scientific connection to the pertinent inquiry" that helps the jury understand the evidence or determine a fact in issue. *Id.* at 592. Moreover, "an inference or assertion must be derived by the scientific method . . . [and] must be supported by appropriate valuation—*i.e.*, 'good grounds,' based on what is known." *Id.* *Daubert's* requirements "appl[y] not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id*.

Courts have recognized their important gatekeeping role with regard to expert testimony, because "expert testimony in general, and a witness's qualifications in particular, also must be judged in light of the potential for the finder of fact to accept blindly the testimony of a witness who the Court has qualified as an expert." *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 537 (D. Md. 2002) (citing *Daubert,* 509 U.S. at 595).

## ARGUMENT

## I.    MR. CASS IS NOT QUALIFIED TO OFFER HIS OPINIONS IN THIS CASE

Under Rule 702, a witness offering purportedly expert opinion must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Thus, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013) (quoting *Kumho Tire Co.,* 526 U.S. at 156) (alterations in original). "*Daubert* requires that the expert possess

10

expertise assessed in the context of the 'nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony.'" *Id.* (quoting *Kumho Tire Co.,* 526 U.S. at 150).  Where "a purported expert witness has 'neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered' that witness's testimony may be excluded." *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 639 (E.D.N.C. 2013) (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).  Thus, for example, an expert witness should be excluded where her "work experience and experience as an expert witness had only tenuous relation" to the issues on which the expert is opining and the expert is "admittedly unfamiliar with certain basic concepts" relevant to those issues.  *Berlyn, Inc.*, 214 F. Supp. 2d at 534–35.

Here, Mr. Cass's experience is almost entirely related to information technology, particularly IT security and risk management.



Ex. 1 at 52:21-22.  He has ***never worked in, taught, published, or lectured*** on patent renewals.  *See* Ex. 4.

Ex. 1 at 56:6-9.

*Id*. at 85:9-22, 86:10-15.

*Id*. at 226:4-232:21.

In fact, Mr. Cass

████████████████████████████████████████████████████████████████.[3] *Id.*

at 78:12-25, 79:8-80:25, 83:15-84:4; *see Berlyn*, 214 F. Supp. 2d at 538 (excluding expert where "plaintiffs anticipated that [the expert] would be able to learn the necessary" background to conduct his analysis "simply by reviewing the texts and articles they presented him" after he was engaged as an expert, noting that otherwise "a person can *become* qualified to offer an expert opinion on the complex topic . . . by applying himself to the topic for five or fewer days").

Despite his lack of any experience—whether vocational or academic—in the patent renewals industry or with patent renewal contracts, Mr. Cass seeks to offer opinion after opinion that assumes intimate familiarity with those topics, including that (a) CPA Global uses "opaque pricing with respect to its Funds Management Charges and Country Charges," July 24 Report ¶ 5; (b) "the way that CPA is charging clients is inconsistent with how a reasonable client would expect to be charged based on the language of CPA's contracts," *id.* at ¶ 12; (c) his personal "expect[ation] that CPA would clearly disclose to clients exactly what they are being charged for Funds Management Charges and Country Charges," *id.*; (d) CPA Global's "Country Charge should only consist of third-party agent fees," *id.* at ¶ 16; (e) "additional country specific personnel would not be required in direct pay countries," *id.* at ¶ 20; (f) the reference in Brainchild's RSA Section 5.3 to a "tariff" would "indicate a standard rate card that could easily be produced upon request and, in my experience, not custom built when requested," *id.* at ¶ 24, and many others.  Mr. Cass has no basis to offer any of these opinions.

Nor is Mr. Cass qualified to offer his opinions on what constitutes a "reasonable" funds management charge.  Mr. Cass is not an economist, econometrician, accountant, trader, or credit

---

[3] Tellingly, Mr. Keogh ██████████████████████████████████████████
████████████████████████ Ex. 9 (Keogh Dep. Tr.) 85:9-19, 256:10-19.

analyst. ████████████████████████████████████████████████████

████████████ Ex. 1 at 61:17-62:6, 74:19-75:11.  Instead, ████████████████████████

████████████████████████████████ *See, e.g.*, *id.* 269:21-25, 276:18-24, 285:2-25,

301:25-302:6, 304:24-305:3, 314:7-14.  But that is simply insufficient.  *See Berlyn,*, 214 F. Supp.

2d at 536 ("general business experience unrelated to antitrust economics does not render a witness

qualified to offer an opinion on complicated antitrust issues such as defining relevant markets").

Indeed, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Ex.

1 at 69:14-71:1, 71:22-74:8; *see also SMD Software*, 945 F. Supp. 2d at 646 (excluding expert

testimony where "[t]here is no match between [the expert's] experience and his conclusions that

the expenses listed in plaintiffs' financial statements are too low").

The simple fact is that Mr. Cass is an IT professional.  He may be a very good IT

professional, but no amount of vague spin about "global business" experience can convert him into

an expert qualified to offer opinions about patent renewal contracts and customers, or funds

management fees offered by patent renewal companies.  Allowing him to do so would be grossly

misleading.  He should be excluded on this basis alone.

## II.    MR. CASS SHOULD NOT BE PERMITTED TO OFFER LEGAL OPINIONS

Not only is Mr. Cass unqualified, but he also seeks to invade the province of the Court by

offering legal opinions and interpretations that must be excluded.  This Court has held that "a

determination of 'whether a party breached a contract, as well as the proper interpretation of a

contract, are 'question[s] of law,' and an expert cannot give an opinion as to the legal obligations

of parties under a contract.'"  *Clarendon Regency IV, LLC v. Equinox Clarendon, Inc.*, 2022 WL

5101691, at *3 (E.D. Va. Oct. 4, 2022) (quoting *In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL

6690337, at*4 (E.D. Va. Aug. 16, 2021)). Such "opinion testimony that states a legal conclusion" is "unhelpful" and should be excluded. *United States v. Perkins*, 470 F.3d 150, 158 (4th Cir. 2006) (quoting *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002)). "The Fourth Circuit has recognized certain telltale signs of inadmissible legal opinion from experts, including '[t]estimony that involves the use of terms with considerable legal baggage.'" *Carlisle v. Allianz Life Ins. Co. of N. Am.*, 2021 WL 5104703, at *8 (E.D. Va. Sept. 13, 2021), *aff'd and adopted*, 2021 WL 8445825 (E.D. Va. Nov. 15, 2021) (quoting *Perkins*, 470 F.3d at 158). For example, "conclusory testimony that a company engaged in 'discrimination,' that a landlord was 'negligent,' or that an investment house engaged in a 'fraudulent and manipulative scheme' . . . nearly always invades the province of the jury." *Perkins*, 470 F.3d at 158 (collecting cases). Mr. Cass runs afoul of this well-established precedent in several ways.

*First*, Mr. Cass opines that Brainchild and other putative class members were "overcharged." *See*, *e.g.*, July 24 Report ¶¶ 6-8, 40, 59; May 8 Report at 5, 7. Whether Brainchild or any other class member was overcharged is an issue for the Court or finder of fact, and Mr. Cass's application of law to fact impermissibly attempts to usurp their roles. *See Perkins*, 470 F.3d at 158.

*Second*, Mr. Cass opines extensively on the meaning of terms in CPA Global's contracts, particularly the meaning of the Country Charge and funds management provisions. *See, e.g.*, July 24 Report ¶¶ 5, 7, 16; May 8 Report at 5. For example, Mr. Cass opines that the "Country Charge should only consist of third-party agent fees as CPA builds their infrastructure cost into the Service Fee." *Id.* at ¶ 16. And "Brainchild is already paying for CPA's infrastructure and personnel in the agreed-upon Service Fee." May 8 Report at 5. But what a particular contractual provision does or does not encompass is a quintessentially legal question on which Mr. Cass has no business

opining.  *See In re Zetia*, 2021 WL 6690337, at *4 (excluding expert "analysis focus[ing] on the language of the" parties' agreement as "pure interpretation of a contract and questions of law").

     *Third*, Mr. Cass opines that each of the CPA Global contracts he reviewed are "substantially the same" with only "minor" differences, and thus can all be analyzed in the same way.  July 24 Report ¶ 42; Sept. 13 Report at 1; Ex. 1 at 169:3-170:3 ███████████

███████████████████████████████████████████████████████████

██████████████████████).  But whether differences between contracts are "substantive" (including for class certification purposes) is a question for the Court, not Mr. Cass.  *See Clarendon Regency*, 2022 WL 5101691, at *3 ("the proper interpretation of a contract, are questions of law'") (quotations and alterations omitted).  Mr. Cass's personal legal opinion, which is based on nothing more than reading the same documents that will be available to the Court, offers nothing helpful.

     The Court should preclude Mr. Cass from offering impermissible legal opinions.

## III.    MR. CASS'S OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE

     To be admissible, expert opinion must be "based on sufficient facts or data," be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge" and, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho Tire*, 526 U.S. at 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

     Among the factors court examine to determine whether an expert's opinions are reliable "include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential

rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).  While an expert seeking to testify based on experience, rather than a scientific technique, is not required to "rely on anything like a scientific method," their experiential testimony must be "reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).

An expert's opinion should not be based "on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999).  Thus, a court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  As the Fourth Circuit has explained, "[w]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.,* 29 F.3d 137, 144 (4th Cir. 1994).

### A.   Mr. Cass's Opinions Regarding the RSAs He Reviewed Are Unreliable

As described above, Mr. Cass's opinions about the meaning of the RSAs he reviewed are not based on anything other than his own say-so.  He has no relevant expertise or experience in the industry.  Ex. 1 at 52:21-22, 53:17-19, 122:2-4. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███  *Id*. at 87:1-18.  ██████████████████████████████████████████

██████████████████████████  *Id*. at 156:12-15.

Indeed, Mr. Cass's unsupported interpretations of the RSAs run head first into their plain language.  Mr. Cass opines that CPA Global's contracts limit the Country Charge and funds management charge to CPA Global's pass-through costs.  July 24 Report ¶¶ 5, 7.  Yet, as discussed

in CPA Global's concurrently filed Motion for Summary Judgment, nowhere does Brainchild's RSA say this.  Indeed, the word "cost" is not even mentioned.  *See, e.g.,* Ex. 3 § 5.3 ("You shall also pay as Charges to us  . . . where applicable, a **Country Charge**, which is set out in a tariff (which may vary from time to time), a current copy of which is available upon request.") (emphasis in original); *id.* § 5.6 ("If the Official Charge, Country Charge and/or other sums of money require to be converted from one currency into the currency, such sums or Charges shall be calculated using our CPA Global rates which include provision for funds management e.g. currency exchange/risk exposure, managing global transactions, credit risk and the financing of renewals payments."); *see also* Ex. 1 at 243:1-9 (███████████████████████████████████████ ███████████████████████); *see also id.* at 222:9-15.

Similarly, Mr. Cass opines (based on nothing more than reading the RSAs) that CPA Global's costs related to the infrastructure and personnel required to renew patents in given jurisdiction, as well as the costs for managing global transactions, are covered in the Service Fee. July 24 Report ¶ 16, 23; Ex. 1 at 209:4-5 (██████████████████████████████████████ █████████████████).  But the RSAs say no such thing.  In fact, the Renewal Notices sent to Brainchild specify that the Service Fee (also known as the "Administration Fee") "relates to the systems and CPA Global personnel that *determine which intellectual property rights need to be renewed in which jurisdictions at which point in time*."  Ex. 10 at 3 (emphasis added).  In contrast, the Country Charge "relates to the infrastructure, CPA Global personnel and third parties (as appropriate) *required in order to execute a renewal in a particular jurisdiction,*" and the funds management charge includes "e.g. managing global transactions, currency risk exposure, credit risk and financing renewal payments."  *Id.*

Finally, Mr. Cass provides no analysis or evidence backing his claim that pricing provisions in the contracts he reviewed are "substantially the same" with only "minor differences" in their language, July 24 Report ¶ 42, an opinion likewise undermined by those very contracts.  In his September 13 Report, Mr. Cass included excerpts from several contracts, including from CPA Global's contracts with ███████████████ and ████████████████████ *id.* at ¶¶ 12, 19.  Yet, the language of both provisions he cites, alongside the language from the Brainchild RSA, belies any claim that the language is "substantially the same":



Putting aside for the moment that it is for the Court, not Mr. Cass, to evaluate what *legal significance* to attach to differences between contracts, it is plainly nonsensical to claim that these provisions are "substantially the same" with only "minor differences" in their language.  Admitting this kind of unreliable *ipse dixit* will only mislead the jury.

**B.   Mr. Cass's Opinions About CPA Global's Costs Are Equally Unsupported and Speculative**

Mr. Cass also offers opinions concerning CPA Global's costs that are untethered to the evidence in this case and completely speculative.

1.   CPA Global's costs to renew non-U.S. patents

Despite never working in the patent renewals industry, Mr. Cass purports to offer his opinions on what CPA Global's costs would be to renew non-U.S. patents. For example, Mr. Cass opines that, "[b]ased on my experience in global organizations, additional country specific personnel would not be required in direct pay countries." July 24 Report ¶ 20. But Mr. Cass provides no evidence or analysis to support this naked speculation. In fact, under cross-examination, ███████████████████████████████████████████████████████

██████████████████████████████████████. Ex. 1 at 226:4-232:21. As Plaintiff's proffered industry expert, John Keogh, testified, ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████ Ex. 9 at 171:4-14. That Mr. Cass's conclusion is unreliable—and, indeed, wrong—is underscored by Mr. Keogh's further testimony that, ██████████████████████████████████

████████████████████████████████████████████████ *Id*. at 107:7-25. Mr. Cass's opinion is untethered to any experience, evidence, or analysis, and should be excluded.

2.   CPA Global's costs for funds management

Mr. Cass's opinions about CPA Global's funds management costs are even less reliable. In his initial report, Mr. Cass provided a range of "reasonable" "fund management rates" of 3.5% on the low end, 11.75% on "average," and 21% on the high end. July 24 Report ¶ 34. In his supplemental report, however, Mr. Cass abandoned this range in favor of a single rate of 7.4%, *id*. at ¶ 36, which reflects the total of Mr. Cass's estimated costs for each of the components identified

in Brainchild's RSA—*i.e.,* currency exchange/risk exposure, managing global transactions, credit risk, and the financing of renewals payments, *id*. at ¶ 33.  Yet strangely, Mr. Cass concedes that the 7.4% rate reflects *more than CPA Global's costs*, as it "assum[es] CPA is allowed to use Funds Management Charges as a profit center."  *Id.* at ¶ 44.  If CPA Global was limited to charging just its costs, Mr. Cass believes it unlikely they would "exceed 3%" per renewal.  *Id.* at ¶ 48.  Each of these opinions is unreliable and should be excluded.

*First*, Mr. Cass provides no basis for his opinion that CPA Global's funds management cost on a per-renewal basis would not exceed 3%.  During his deposition, Mr. Cass ███████████████

████████████████████████████████████████████████████████████████████

███████████ .  Ex. 1 at 320:12-321:6.

*Second*, Mr. Cass's 7.4% rate is based on an assumption entirely at odds with Brainchild's claim.  Brainchild alleges that CPA Global breached its agreements with putative class members by imposing a funds management charge in excess of "its actual costs of making payments."  FAC ¶ 3.  Yet, Mr. Cass's 7.4% assumes that CPA Global was entitled to generate a profit from the funds management charge.  In other words, he opines that CPA Global was permitted to charge "in excess" of its actual costs.  Because Mr. Cass proposes to calculate damages based on an assumption entirely inconsistent with Brainchild's claim, it is unhelpful to the tier of fact and must be excluded.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (expert testimony must be "'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's case") (quoting *Daubert*, 509 U .S. at 597).

*Third*, even if Mr. Cass's 7.4% funds management rate was consistent with Brainchild's claim (which it is not), it is unsupported by any facts or analysis.  During his deposition, ███████

██████████████████████████████████████████████████████ Ex. 1 at 269:21-25

(███████████████████████████████████████████), 276:18-

24  (████████████████████████████████████████████████████

████████████████████████████), 285:2-286:9 (██████████████████████████

███████████████████████████████), 304:24-305:16 (███████████████████

████████████████████████), 314:7-14 (██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████).  As discussed above, however, Mr. Cass has no relevant experience and in

no case was he able to provide a single concrete example that he used as a baseline—whether

relevant or irrelevant.  This is precisely the type of "*ipse dixit* of the expert" that courts routinely

reject.  *Joiner*, 522 U.S. at 146.

    In the very few instances where Mr. Cass does cite any sort of evidence, it is untied to his

opinions.  For example, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.  July 24

Report ¶ 33.d.  Yet, Mr. Cass fails to explain why this figure supports a rate of 3%.  Similarly, ███

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████  *Id*. at ¶ 33.a.  Yet, he offers no

explanation as to how this email supports his 1.6% estimated rate for currency exchange ***and***

currency risk exposure.  In fact, under cross-examination, ████████████████████████████

███████████████████████████████████████████████████.  Ex. 1 at 280:18-

281:5.

    Finally, Mr. Cass has offered no basis for his revised opinion that a single, fixed "Funds

Management rate" is appropriate for every putative class member.  Indeed, ███████████████



*id.* at 268:7-8, ████████████████████████, *id.* at 262:6-263:4.  Notably, a single fixed fee is contrary to both Mr. Cass's own meagre experience and John Keogh's testimony.  Mr. Cass testified that ████████████████████ *Id.* at 65:15-67:15, 69:14-74:8.  And Mr. Keogh likewise testified ████████████████ Ex. 9 at 143:13-145:17, 153:16-154:18.  In short, Mr. Cass's opinion that a single fixed funds management rate should apply to each class member is unsupported and unreliable.

3.    CPA Global's ability to provide cost information

Presumably concerned that his opinions on CPA Global's costs are speculative, Mr. Cass hedges by asserting "that CPA would know what those costs were with reasonable certainty," and that, once this cost data is produced (even though discovery has closed), he should be accorded a third attempt to calculate damages "post-class certification."  July 24 Report ¶¶ 12, 27, 39.  But Mr. Cass fails to cite a shred of evidence in support of this assertion, ████████████████ Ex. 11 (████ Dep. Tr.) 30:9–32:4, 35:1-23, 46:16–48:15; Ex. 12 (████ Dep. Tr.) 52:23-54:22.

**C.    Mr. Cass's Opinion That CPA Global's Pricing and Billing Is Opaque Is Irrelevant and Unsupported**

Mr. Cass's opinion that CPA Global's pricing and billing is "opaque" is both irrelevant and equally untethered to any relevant experience, analysis, or evidence.  *See* July 24 Report ¶ 12.  As

an initial matter, Mr. Cass's opinion is irrelevant and unreliable because Brainchild specifically

agreed to the level of detail about pricing that CPA Global provides.  Section 5.7 of the RSA states:

"We shall give you our best estimate of the **total aggregate Charges** in each Renewal Notice which

we send you in relation to the Services (including the Service Charge, Country Charge and the

Official Charge)."  Ex. 3 (emphasis added).  Mr. Cass's personal view of the "opacity" of CPA

Global's pricing and billing is thus irrelevant and unreliable.  *See Navigators Ins. Co. v. Goyard,*

*Inc.*, 608 F. Supp. 3d 44, 48–49 (S.D.N.Y.), *reconsideration denied*, 623 F. Supp. 3d 220

(S.D.N.Y. 2022) (expert's analysis on the meaning of an insurance policy "cannot help the finder

of fact because the analysis [the expert] conducts is the same analysis that a court itself would

conduct in order to interpret the terms of the insurance policy"); *Edmondson v. RCI Hosp.*

*Holdings, Inc.*, 2020 WL 1503452, at *9–10 (S.D.N.Y. Mar. 30, 2020) (excluding expert testimony

as unreliable where it is "inconsistent with the express terms of Plaintiffs' contracts and contrary

to industry practice").



Even if Mr. Cass's opinion were relevant (and it is not),

Ex. 1 at 125:1-7.  But, as discussed above, Mr. Cass

lacks any grounds to opine on what a "reasonable client" would expect.  *Id*. at 52:21-22, 53:17-19.

*Id*. at 87:1-18, 122:2-4.

*id*. at 150:19-153:23,

*id*. at 150:19-153:6

); *see also* Ex. 2 at 238:7-19; Ex. 9 at 76:12-19; *Berry v. Crown Equip. Corp.*,

108 F. Supp. 2d 743, 755 (E.D. Mich. 2000) (expert "could not establish that his theories are

generally accepted in the" relevant community where "the industry standard is overwhelmingly contrary to his view").

### D.       Mr. Cass's Methodology for Estimating Class-Wide Damages Is Unreliable

Mr. Cass's methodology for calculating class-wide "overcharges" is unreliable for at least four reasons.

*First*, the methodology is predicated on the unsupported opinions discussed at length above, including that CPA Global's Country Charge should have been limited to third-party agent fees and 7.4% is an "appropriate" "Funds Management rate" for all putative class members.  July 24 Report ¶¶ 16, 42, 44-46.  Because both of these opinions should be excluded, so too should Mr. Cass's estimates of "overcharges."

*Second*, Mr. Cass calculates his class-wide "overcharges" using a sample of 600 renewals. *Id.* at ¶ 42.  But the sample was not random and thus not representative.  *See United States v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *13 (N.D. Tex. June 20, 2016) (excluding expert's testimony where his "methodology was fundamentally flawed" because his "sample was not randomly selected from the entire Population, and he did not control for variables . . . identified as important").  Mr. Cass selected his sample "using a random number generator formula . . . [which] assigned a numerical 0 or a 1 to each record . . . .  The first 600 records that had a '1' assigned . . . were selected."  July 24 Report ¶ 42 & n.47.  But, as Dr. Mathur explained, because Mr. Cass selected the first 600 records that were assigned a "1," each renewal did not have an equal chance of being selected.  Ex. 8 at ¶ 43.  Indeed, every one of the renewals Mr. Cass selected was from only the first two weeks of the class period—January 2, 2017 to January 15, 2017.  *Id.*

As problematic, Mr. Cass's sample is not replicable, because he used Microsoft Excel's random number generator to randomly assign records a 1 or a 0.  Each time the spreadsheet is refreshed, the random generator would re-run and assign a new set of 1's and 0's to the population,

thus precluding replication of the sample Mr. Cass used.  July 24 Report ¶ 42 n.47; Ex. 8 at ¶ 42 n.64.

*Third*, Mr. Cass's "overcharge" estimates fail to exclude clients whom Mr. Cass admits would not be members of the class because they negotiated their Country Charge and funds management charge.  July 24 Report ¶ 62.  His estimates also fail to exclude clients whom Mr. Cass conceded may not have been overcharged.  This includes (a) ███████████████████

███████████████████████████████████████████████████

███████████ Ex. 1 at 336:4-19, and (b) ███████████████████

███████████████████████████, *id*. at 336:21-339:17.  As to these clients,

███████████████████████████████████████████████

███████████████████████. *Id*.; *see also id*. at 123:7-19 (███████████████████

███████████████████████████████████████████████

███████████████████████████).  Thus, Mr. Cass himself admits that

his aggregate "overcharge" estimates are wrong, and thus unreliable.[4]

*Fourth*, Mr. Cass improperly excludes from his estimates renewals for which certain data fields were not populated in the invoicing data produced by CPA Global.  July 24 Report ¶ 51. Mr. Cass opines that this is proper because CPA Global's corporate representative, ████████

████, testified that data was not reliable.  *Id*.  However, this is simply untrue.  Mr. ████████

---

[4]   Mr. Cass asserts that the identification of clients who negotiated their contracts can be made post-class certification based on examining individual "client contracts and CPA's client notes."  July 24 Report ¶ 62.  But the testimony on which Mr. Cass relies confirms ███████████
███████████████████████████████████████████████, Ex. 12 at 152:13-153:17—
*i.e.,* hundreds of current and former CPA Global employees who managed thousands of accounts, with contracts dating back to at least the mid-2000s.  *See* May 19, 2023 Decl. of Andrew Proctor (Dkt. 70-1) at ¶ 10.

testified 

██████████████████████████████████. Ex. 11 at 136:3-137:3. ████████

████████████████████ *See Tyger Const.*, 29 F.3d at 144 (holding it was reversible error to admit expert opinion on damages that was "based on assumptions which find no support in the record").

## CONCLUSION

For the foregoing reasons, CPA Global respectfully requests that the Court grant its motion to exclude the expert testimony and opinions of David Cass.

Dated: September 29, 2023                          Respectfully submitted,

                                                  /s/ Eric C. Lyttle
                                                  QUINN EMANUEL URQUHART &
                                                  SULLIVAN, LLP
                                                  Eric C. Lyttle, VSB No. 48518
                                                  Meghan M. McCaffrey (*pro hac vice*)
                                                  J. Matthew Hamann (*pro hac vice*)
                                                  1300 I Street, NW, Suite 900
                                                  Washington, D.C. 20005
                                                  Phone: (202) 538-8000
                                                  Fax: (202) 538-8100
                                                  ericlyttle@quinnemanuel.com
                                                  meghanmccaffrey@quinnemanuel.com
                                                  matthewhamann@quinnemanuel.com

                                                  Michael L. Fazio (*pro hac vice*)
                                                  Anthony P. Alden (*pro hac vice*)
                                                  865 South Figueroa Street, 10th Floor
                                                  Los Angeles, California 90017
                                                  Phone: (213) 443-3000
                                                  Fax: (213) 443-3100
                                                  michaelfazio@quinnemanuel.com
                                                  anthonyalden@quinnemanuel.com

                                                  *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September 2023, I filed the foregoing document electronically with the Clerk of the Court using the ECF system, and caused to be served by electronic mail a copy of the foregoing document upon the following parties:

BROWN NERI SMITH & KHAN, LLP
Geoffrey A. Neri, Esq, VSB No. 72219
Ethan J. Brown, Esq.
Ryan Abbott, MD, PhD, Esq.
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Geoff@bnsklaw.com
Ethan@bnsklaw.com
Ryan@bnsklaw.com

*Counsel for Plaintiff and the Proposed Class*

*/s/ Eric C. Lyttle*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Eric C. Lyttle, VSB No. 48518

1300 I Street, NW, Suite 900
Washington, D.C. 20005
Phone: (202) 538-8000
Fax: (202) 538-8100
ericlyttle@quinnemanuel.com